CASE NO:  8:24cv02383

| | |
|---|---|
| PETITIONERS: | IN THE UNITED STATES DISTRICT COURT |
| **JOSEPH DEAN**, a Tampa resident | MIDDLE DISTRICT OF FLORIDA |
| DEFENDANTS: | |
| **ROKU INC**, a Delaware corporation headquartered in San Jose, California | |
| | TAMPA DIVISION |

**SECOND AMENDED COMPLAINT OF ANTI-COMPETITIVE BEHAVIOR BY A MONOPOLY**

## I. INTRODUCTION

1. Plaintiff Joseph Dean ("Plaintiff" or "Dean") brings this antitrust action against Roku Inc. ("Roku" or "Defendant") under Section 2 of the Sherman Act and Section 3 of the Clayton Act to remedy anticompetitive conduct that has harmed competition, innovation, and consumers in the markets for applications that interact with Roku devices as well as the market for streaming platform operating systems.

1

2. Since 2010, Plaintiff has developed software applications under the name "Veamcast" that has features which enhance the streaming experience for Roku users, including remote control capabilities, content discovery, and social sharing features. Development began as an individual effort by Plaintiff and has continued through various iterations to the present, as documented in Exhibit C.

3. Roku is the dominant streaming platform in the United States, recently announcing it has reached 90 million streaming households. [Exhibit A1]. In its February 2025 email to developers [Exhibit A2], Roku claimed "This incredible growth is largely due to our amazing developers, who work hard to deliver intuitive, high-performance experiences filled with great content that delights streamers" [Exhibit A1], yet in its public press release about the same milestone, Roku attributed this success solely to "our laser focus on simplifying and enhancing the streamer's journey" with no mention of developers' contributions. [Exhibit A2] Having achieved its dominant position by positioning itself as an "open platform" for developers, Roku has systematically reversed course, implementing a series of API restrictions designed to eliminate competition and advantage its own services.

4. Roku's anticompetitive conduct includes: a) Systematically restricting access to critical APIs, particularly External Control Protocol (ECP) commands and search functionality, which third-party applications like Plaintiff's rely on to

provide functionality. [Exhibits 4b, A3, B]; b) Leveraging its dominant market position to advantage its own applications, particularly "The Roku Channel" and the "Roku Mobile App" through preferential interface placement and exclusive access to platform features. [Exhibits 7, 9]; c) Implementing undocumented and retroactive API changes that specifically target competitive functionality while maintaining the same functionality for Roku's own applications. [Exhibits A3, B]; d) Creating a two-tier system where only Roku maintains access to critical platform features, effectively foreclosing competition. [Exhibit 3]; and e) Establishing exclusive dealing arrangements through technical restrictions that substantially foreclose competition.

5. Roku CEO Anthony Wood initially promised that Roku would "let third parties publish content and applications that consumers can access directly from their TV" [Exhibit 1]. After achieving market dominance, Roku reversed this commitment, implementing technical restrictions that foreclose the promised third-party access.

6. Wood later revealed Roku's strategy shift: "actually the future of TV is not apps because people are tired of looking in 6,000 apps for content," and stated that as The Roku Channel "gets bigger and bigger... you can imagine someday it might become the Roku home screen." [Exhibits 2, 3].

7. Plaintiff invested substantial resources developing applications that integrate with Roku's platform, relying on documented APIs for remote control,

content casting, and social sharing features. [Exhibits 5, C]. Through Roku's retroactive revocation of API access without notice, Plaintiff has been effectively foreclosed from competing, suffering substantial damages.

8.  Roku's conduct constitutes unlawful monopolization under the Sherman Act and exclusive dealing under the Clayton Act. This anticompetitive behavior has harmed not only Plaintiff but competition itself, reducing innovation, consumer choice, and quality in the relevant markets.

9.  Plaintiff seeks injunctive relief to restore competition, including restoration of API access on non-discriminatory terms, as well as damages for the substantial harm caused by Roku's anticompetitive conduct.

## II. JURISDICTION, VENUE, AND PARTIES

10. This Court has subject matter jurisdiction pursuant to: a) 28 U.S.C. § 1331 (federal question jurisdiction) b) 15 U.S.C. § 15 (Clayton Act jurisdiction for private antitrust actions) c) 15 U.S.C. § 26 (Clayton Act jurisdiction for injunctive relief)

11. Venue is proper in this District under: a) 28 U.S.C. § 1391(b)(2) as a) substantial events giving rise to the claims occurred in this District; b) Plaintiff resides in this District; c) Defendant conducts business in this District

12. Plaintiff Joseph Dean is an individual residing at 5131 Mayfair Park Court, Tampa, Florida 33647.

13. Defendant Roku Inc. is a Delaware corporation with its principal place of business at 1701 Junction Court, Suite 100, San Jose, California 95112. Roku Inc. develops and sells smart TV hardware and software. The company was founded in 2002 by Anthony Wood, who remains the CEO. Roku has a dominant position in the smart TV market, with Wood maintaining controlling voting power through his ownership of both Class A and Class B shares.

## III. FACTUAL BACKGROUND

### A. Development of the Veamcast Platform

14. Since 2010, Plaintiff has been developing apps and an API for a video/voice/photo/link publishing and sharing service named Veamcast. The apps include a Windows app, a mobile app, web sites, web services, cloud services and email services. [Exhibit C].

15. The Veamcast apps rely heavily on Roku APIs and were designed to allow users to: a) Record, capture, share, publish and link to media content; b) Create and share playlists containing various media types; c) Generate deep links within Roku apps that enable direct access to specific content, including selection of specific content within apps, episode selection, timestamp-based playback, and direct content access across multiple streaming platforms; d) Enable communication between users; and e) Cast content from various sources to Roku TVs. [Exhibit 5]

16. The Veamcast Windows and Android apps use the External Control Protocol (ECP) to control and cast content to Roku TVs. They communicate with the Veamcast Roku App or deep link into other apps for the purpose of casting content from AWS cloud or deep linking into other services. They also act as a remote-control device with enhanced features including communication, moderating, rating and sharing content. [Exhibit 5]

17. The Veamcast Roku app was designed to perform the functions of the other Veamcast apps in their ability to play content and was controlled by the other Veamcast apps using ECP. It provided a second screen experience, was designed to play Veamcast content from AWS cloud, and use ECP commands to deep link into content from other apps including YouTube, Netflix, Prime, Disney+/Hulu, and any other streaming service that implemented deep linking. [Exhibit 5]

**B. Roku's API Restrictions and Anticompetitive Conduct**

18. Roku has systematically restricted API access that is essential for third-party applications to compete, while maintaining the same functionality for its own applications:

19. On August 24, 2024, Plaintiff learned that Roku updated its developer documentation to state: "Support for sending ECP commands from within a Roku channel application has been discontinued" and "ECP commands may

6

not be sent from 3rd-party platforms (for example, mobile applications)." [Exhibit 4b].

20. When Plaintiff sought clarification in the Roku Community Forum, moderators with pseudonyms and taglines proclaiming not to be Roku employees provided contradictory information, with some claiming the limitation was not new while others confirmed the discontinuation of the feature. A Roku representative eventually confirmed: "support for ECP commands from within Roku channel applications and other platforms, including mobile remote apps, has been discontinued." This post was subsequently removed from the forum. [Exhibit 4a].   Plaintiff also discovered that the forum actively prevents users from using the word "lawyer" in posts and blocks attempts to share evidence of this censorship with an error message claiming "maximum flood limit reached," further demonstrating Roku's pattern of suppressing legitimate discussions about potential legal recourse. [Exhibits 4a, 6] When Plaintiff shared a demo video of his application in the forum, a Roku Community Streaming Expert responded dismissively, saying 'Looks interesting, but it seems that anytime Roku opens up their devices to external apps they get burned by some douche bag that takes over a Roku device with some kind of scheme to show ads or otherwise make the douche bag money,' revealing Roku's hostile attitude toward independent developers and mischaracterizing legitimate applications as malicious [Exhibit 4a].

21. On February 6, 2025, Roku announced: "As of Roku OS 12.0, the 'search' command is no longer available," retroactively confirming the removal of functionality that had been disabled since August 2023 without notice. [Exhibits A1, A3]. Notably, this announcement came over two months after Plaintiff filed the original complaint in this action. The email employed deceptive tactics to minimize attention to these significant API changes, using the subject line "Roku crosses 90M streaming households, new Tax Withholding report, new requirements for ECP commands, and more!" despite containing no actual tax withholding report, and burying critical API changes under "and more!" [Exhibit A1]. The same email announced contradictory security requirements for ECP commands, stating both that "the Control by mobile apps setting must be Enabled for a Roku device to receive ECP commands" and that "ECP commands may not be sent from 3rd-party platforms (for example, mobile applications)." [Exhibit A3]

22. Roku has implemented a pattern of retroactive and undocumented API changes that specifically target competitive functionality while maintaining the same capabilities for its own services. This practice is confirmed in developer forum discussions dating back to October 2023, where developers complained about the silent removal of search functionality. [Exhibit B]. This practice not only harms existing applications but creates development uncertainty that discourages and deters new market entry.

**C. Roku's Platform Transformation and Content Control Strategy**

23. Roku's conduct represents a dramatic reversal from its earlier public commitments. In a 2009 interview, Roku CEO Anthony Wood promised that Roku would "let third parties publish content and applications that consumers can access directly from their TV" and compared Roku's platform to the iPhone App Store. [Exhibit 1].

24. As Roku achieved platform dominance, Wood revealed the company's strategy shift, stating: "actually the future of TV is not apps because people are tired of looking in 6,000 apps for content." He further revealed Roku's intent to transform The Roku Channel into the primary interface, stating: "as it gets bigger and bigger and has more and more content, you can imagine someday it might become the Roku home screen." [Exhibits 2, 3].

25. Wood explicitly acknowledged using platform-wide data to advantage Roku's services over third-party developers, stating: "because we have platform-wide data, we can do a better job of merchandising than they can do on their own." He further admitted creating a two-tier system where "90% of our customers... will get more viewing and better economics by working with us directly" while only large "destination apps" would maintain independence. [Exhibit 3].

26. Since 2022, Roku has implemented systematic changes to its user interface that advantage The Roku Channel over competing applications, including: a) Modifying the TV interface to automatically load The Roku Channel on

9

startup; b) Repurposing the "Live TV" function to prominently feature The Roku Channel; c) Allocating the majority of platform advertising space to promote Roku Channel content; d) Using screensaver advertising exclusively for Roku Channel ads; and e) Systematically demoting recently used third-party apps. [Exhibit 9]

27. On November 14, 2023, Roku launched Photo Streams, enabling the casting of photos from the Roku Mobile App, replicating core functionality of Plaintiff's Veamcast platform, while restricting the APIs that would allow Plaintiff's application to provide similar features. [Exhibit 7]

## IV. RELEVANT MARKETS

28. The primary relevant market is the market for applications that control and interact with Roku devices, which includes: a) Software applications designed to remotely control, cast content to, and interact with Roku streaming devices and Roku-powered smart TVs; b) Applications that utilize Roku's APIs for remote control functionality, content discovery, and deep linking; and c) Applications providing enhanced capabilities beyond Roku's standard remote, including content sharing, search functionality, and social features.

29. This market has distinct product characteristics that distinguish it from other potential substitutes: a) Specialized functionality requiring Roku-specific APIs; b) Distinct customers (Roku device owners); c) Roku's exclusive control over

access to essential APIs; and d) Industry recognition as a distinct market segment.

30. The secondary relevant market is the U.S. streaming platform operating system market, which includes: a) Operating systems embedded in smart TVs and streaming devices; b) Platform services for content delivery; c) Content discovery and navigation interfaces; and d) Advertising delivery systems.

31. The relevant geographic market is the United States, where: a) Roku implements its developer policies consistently nationwide; b) Technical standards and API access are administered centrally; c) Roku maintains distinct territory-based stores with U.S.-specific terms; and d) Streaming rights and content agreements are typically negotiated nationally.

32. Substantial barriers to entry exist in both relevant markets, including: a) Network effects between users, content providers, and developers; b) Roku's exclusive control over essential APIs; c) Technical expertise required for streaming platform integration; d) Mandatory certification requirements imposed by Roku; and e) Static Analysis testing used to prevent workarounds.

## V. ROKU'S MONOPOLY POWER

33. Roku possesses monopoly power in both relevant markets, as demonstrated by direct and circumstantial evidence:

34. Direct evidence of Roku's monopoly power includes: a) Exclusive control over essential APIs necessary for competition; b) Ability to unilaterally modify or

remove API access without market consequences, as demonstrated by the retroactive removal of search functionality. [Exhibits A3, B]; c) Power to implement contradictory technical requirements without justification; d) Capacity to advantage its own services through platform modifications; and e) Ability to retroactively remove functionality without prior notice to developers.

35. Circumstantial evidence of Roku's monopoly power includes: a) 48.3% market share in the U.S. streaming platform operating system market as of Q1 2024, growing from 33% in 2020. [Exhibit 11]; b) February 2025 announcement of reaching 90 million streaming households. [Exhibits A1, A2]; c) More than triple the market share of its nearest competitor; d) Control of licensing relationships with 15+ TV manufacturers; and e) Platform revenue growth from $1.3 billion in 2020 to over $3.1 billion in 2023.; f) Roku's own description in its 2024 Form 10-K of being 'the #1 selling TV OS in the U.S., Canada, and Mexico' and having presence 'in nearly half of all U.S. broadband households.' [Exhibit 14]"

36. Roku's monopolistic intent is evidenced by CEO Anthony Wood's repeated statements about global domination, including his declaration that "Roku's mission is to power every TV in the world - that's what we're focused on" [Exhibit 12] and his confirmation during Roku's IPO that "our goal is to

power every TV in the world" [Exhibit 13], demonstrating a consistent strategy focused on achieving monopoly power.

37. Roku has willfully acquired and maintained its monopoly power through exclusionary conduct rather than superior products or business acumen, as demonstrated by: a) Its initial positioning as an open platform before systematically reversing those commitments; b) Implementing targeted API restrictions that specifically disadvantage competitors; c) Maintaining identical functionality for its own applications while restricting third-party access; and d) Exploiting platform control to identify and dominate emerging market segments. CEO Wood admitted he "was surprised" by FAST channels and "didn't predict" their success, yet Roku rapidly became "the biggest FAST channel distributor" by leveraging its platform dominance. [Exhibit 8].

## VI. ANTICOMPETITIVE CONDUCT

### A. Systematic API Restrictions to Exclude Competition

38. Roku has implemented a deliberate strategy of restricting API access that third-party applications require to compete effectively, while maintaining the same functionality for its own applications:

39. Roku has systematically restricted access to External Control Protocol (ECP) commands, which provide essential remote-control functionality, by: a) Prohibiting ECP commands from being sent from third-party platforms; b) Creating contradictory security requirements that make compliance

13

impossible; and c) Maintaining full functionality for Roku's own mobile application. [Exhibits 4b, A3]  These API restrictions specifically target competitive functionalities while Roku's own applications maintain access to these same features, creating an unlevel playing field designed to eliminate competition. This conduct parallels the anticompetitive behavior found illegal in United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001), where Judge Thomas Penfield Jackson found that Microsoft had 'placed an oppressive thumb on the scale of competitive fortune' to guarantee its continued dominance in the relevant market. Like Microsoft, Roku has placed its thumb on the scale through systematic API restrictions that specifically target competitive functionality while maintaining identical capabilities for its own applications.

40. Roku retroactively removed the "search" command functionality in Roku OS 12.0 without documentation or announcement, silently disabling this feature in or before October 2023 but not documenting the change until February 2025. [Exhibits A3, B]. Despite multiple developer complaints about non-functional search API endpoints, Roku maintained misleading documentation for at least 16 months. [Exhibit B]

41. These API restrictions specifically target competitive functionalities while Roku's own applications maintain access to these same features, creating an unlevel playing field designed to eliminate competition.

42. Roku explicitly warns in its 2024 Form 10-K that "if users sign up for offerings and services outside of our streaming platform or through other apps on our streaming platform, our business may be harmed," and specifically acknowledges that "if users reduce their use of our streaming platform for these purchases or subscriptions for any reason, including opting to pay for services directly with content partners or by other means for which we do not receive attribution, our business may be harmed." [Exhibit 14] These statements reveal Roku's anticompetitive motives for systematically restricting API access: to prevent users from accessing content and services through third-party applications that would compete with Roku's own offerings or bypass Roku's revenue collection mechanisms. This documented concern about users circumventing Roku's platform demonstrates that Roku's API restrictions are not implemented for legitimate technical or security reasons, but rather as part of a deliberate strategy to maintain platform dominance and protect revenue streams by foreclosing competition from third-party developers like Plaintiff.

**B. Leveraging Platform Dominance to Advantage Roku's Own Services**

43. Roku has systematically modified its platform to advantage The Roku Channel over competing third-party applications through multiple user interface mechanisms that cannot be replicated by competitors: a) Auto-loading The Roku Channel upon device startup; b) Repurposing the "Live TV"

function to feature The Roku Channel content; c) Using screensaver advertising exclusively for Roku ad content; and d) Systematically demoting recently used third-party apps. [Exhibit 9] These interface modifications directly implement the strategy described in Roku's 2024 Form 10-K to integrate The Roku Channel 'throughout the Roku Experience,' which has features that 'can surface content to our viewers directly.' [Exhibits 9, 14]

44. Roku has engineered its interface to require additional steps to access competing apps while automatically defaulting to Roku Channel content, creating artificial barriers to competitor discovery and usage.

45. Roku implements "platform updates" that progressively diminish competitor visibility while enhancing Roku Channel prominence, including converting the "Sports" section to default to Roku Channel and modifying the "Featured Free" section to predominantly feature Roku Channel content.

## C. Creating a Double-Bind for Content Providers

46. Roku has created a coercive double-bind for content providers by forcing them to either: a) Remain in their own less discoverable apps with diminished visibility in the Roku interface; or b) Place their content in The Roku Channel where Roku controls all advertising revenue and user data.

47. Content providers who maintain their own apps face systematic disadvantages through diminished visibility, exclusion from featured sections, and reduced discoverability through automatic interface behaviors.

16

48. Content that appears in The Roku Channel grants Roku complete control over advertising placement, revenue allocation, user data collection, and content presentation.

49. CEO Anthony Wood explicitly acknowledged this strategy, stating that for "90% of our customers... they will get more viewing and better economics by working with us directly." [Exhibit 3]

**D. Platform Data Exploitation to Disadvantage Developers**

50. Roku obtains detailed information about third-party applications through its mandatory app review process, including feature sets, technical implementation details, and user experience innovations.

51. Following app review, Roku has implemented similar features in its own applications, as demonstrated by the launch of Photo Streams in 2022, replicating core functionality of Plaintiff's platform. [Exhibit 7]

52. Roku leverages user data obtained through its platform to identify successful content trends and viewing patterns, then uses this data to advantage its own services while denying the same insights to competitors.  Roku confirms this practice in its 2024 Form 10-K, stating that its 'direct relationship with customers provides us with insights about their behavior on our streaming platform' and that 'this first party data enables us to develop actionable insights' which are used to advantage Roku's own services. [Exhibit 14]".

17

**E. Exclusive Dealing Through Technical Restrictions**

53. Roku's technical restrictions effectively create exclusive dealing arrangements by: a) Making the Roku Mobile App the only application that can fully control Roku devices; b) Forcing users to use only Roku's content discovery mechanisms; c) Creating technical barriers that prevent third-party applications from providing competing functionality; and d) Designing systems that provide Roku's services with exclusive access to platform features.

54. These restrictions substantially foreclose competition in the market for applications that control and interact with Roku devices by eliminating core functionality required for competitive products and creating artificial technical barriers unrelated to legitimate security concerns.

55. The exclusionary effect of these practices is evidenced by the creation of insurmountable barriers to any new third-party remote-control applications and content discovery tools, while rendering existing applications increasingly non-functional as they attempt to comply with contradictory requirements. The February 2025 announcement of new requirements for ECP commands creates an impossible compliance scenario by stating both that 'the Control by mobile apps setting must be Enabled for a Roku device to receive ECP commands' while simultaneously mandating that 'ECP commands may not be sent from 3rd-party platforms (for example, mobile applications).' [Exhibits

18

A1, A3]. This technically precludes any viable competition in this market while allowing Roku to claim third-party applications are still theoretically possible."

## VII. ANTITRUST INJURY TO PLAINTIFF

56. Plaintiff has suffered direct, substantial, and cognizable antitrust injury as a result of Roku's anticompetitive conduct. This injury is of the type the antitrust laws were designed to prevent and flows directly from Roku's exclusionary practices that harm competition in the relevant markets.

57. Plaintiff directly competes—or but for Roku's conduct, would compete—in the market for applications that control and interact with Roku devices, offering enhanced functionality beyond Roku's first-party application.

58. Roku's systematic API restrictions have effectively foreclosed Plaintiff from this market by: a) Disabling critical ECP functionality that Plaintiff's applications rely on for remote control capabilities; b) Removing search functionality necessary for content discovery features; c) Revoking deep linking capabilities essential for content sharing; and d) Creating technical barriers that render Plaintiff's core functionality inoperable. [Exhibits 5, C]

59. These API restrictions directly target functionalities that differentiate Plaintiff's applications from Roku's own, enabling Roku to eliminate competitive threats while maintaining the same capabilities for its own services.

60. The indifference shown by Roku toward developers' investments and livelihoods directly reflects CEO Anthony Wood's broader attitude toward ecosystem responsibilities. In discussing his philanthropic approach, Wood dismissively stated "you can't help people, they have to help themselves" and described homelessness as "an intractable problem" where "people have to help themselves." [Exhibit 10]. Wood's focus on personal convenience—funding research to cure jet lag because it "ruins my vacation"—rather than addressing systemic issues parallels Roku's approach to its developer community: maximizing corporate benefit while showing dismissive indifference to the harm caused to ecosystem participants who helped build Roku's success.

61. Plaintiff has suffered substantial economic harm from Roku's anticompetitive conduct, including: a) Wasted development costs for functionality subsequently disabled by Roku's API restrictions; b) Lost revenue from applications rendered non-functional; c) Depreciated asset value for technology investments; and d) Lost market share and business opportunities, as documented in Exhibit C.

62. The economic harm suffered by Plaintiff directly resulted from Roku's anticompetitive conduct rather than normal competitive forces, as evidenced by the targeted nature of API restrictions that specifically disabled Plaintiff's differentiating features.

## VIII. CAUSES OF ACTION

**COUNT I: Monopolization in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

63. Plaintiff incorporates paragraphs 1-62 by reference.

64. As detailed above, Roku possesses monopoly power in the market for applications that control and interact with Roku devices, and in the U.S. streaming platform operating system market, as evidenced by its control over essential APIs, dominant market share, and ability to exclude competition through technical restrictions. [Exhibits 11, A1, A2].

65. Roku has willfully acquired and maintained this monopoly power through exclusionary and anticompetitive conduct rather than superior products or business acumen, including: a) Systematically restricting access to critical APIs while maintaining the same functionality for its own applications. [Exhibits 4b, A3, B]; b) Retroactively removing documented functionality without notice; c) Implementing contradictory technical requirements that create impossible compliance scenarios; d) Leveraging platform control to advantage its own services; and e) Creating a double-bind for content providers that forecloses competition.

66. Roku's anticompetitive conduct has caused actual harm to competition in the relevant markets, including substantial foreclosure of competition, reduction in consumer choice, degradation of quality and functionality, and suppressed innovation.

21

67. This conduct lacks any legitimate business or technical justification, as Roku has the ability to control access to its APIs selectively—evidenced by its maintenance of identical functionality for its own applications while denying access to competitors. Providing secure, documented API access to third-party developers on fair and non-discriminatory terms is technically feasible, as demonstrated by Roku's own applications continuing to use these same functions.

68. Plaintiff has suffered antitrust injury as a direct result of Roku's monopolistic conduct, including foreclosure from the relevant market, substantial economic harm, and lost business opportunities, as demonstrated in [Exhibit C].

**COUNT II: Exclusive Dealing in Violation of Clayton Act § 3 (15 U.S.C. § 14)**

69. Plaintiff incorporates paragraphs 1-62 by reference.

70. Roku has implemented a system of technical restrictions and platform controls that effectively constitute exclusive dealing arrangements by: a) Making the Roku Mobile App the exclusive application that can fully control Roku devices; b) Creating technical barriers that prevent third-party applications from accessing essential functionality; c) Implementing mandatory certification requirements that exclude competing applications; and d) Designing systems that provide Roku's services with exclusive access to platform features.

71. These exclusive arrangements are enforced through technical means rather than contractual provisions, but achieve the same anticompetitive effect by eliminating third-party applications' ability to effectively compete and forcing users to use Roku's applications for essential tasks.

72. These arrangements substantially lessen competition in the relevant markets by foreclosing competition, creating barriers to entry, reducing consumer choice, and suppressing innovation in streaming interaction technologies.

73. The substantial foreclosure effect is evidenced by the effective elimination of previously viable competitor applications and the inability of new applications to enter the market with competing functionality.

74. These exclusive arrangements lack any legitimate business justification, as demonstrated by Roku's maintenance of identical functionality for its own applications, contradictory documentation about technical requirements, and targeted restrictions aimed at competitive functionalities.

75. Plaintiff has suffered antitrust injury as a direct result of these exclusive dealing arrangements, including substantial economic harm, foreclosure from the relevant market, and lost business opportunities documented in Exhibit C.

**IX. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award Plaintiff treble damages pursuant to 15 U.S.C. § 15(a) in an amount to be determined at trial, but not less than $150 million (representing threefold the sustained damages of $50 million);

C. Grant injunctive relief under 15 U.S.C. § 26 requiring Roku to:

- Restore third-party access to all APIs on non-discriminatory terms;

- Cease anticompetitive practices;

- Provide transparent API access policies;

- Divest ownership of The Roku Channel to eliminate the inherent conflict of interest between Roku's role as a platform provider and content competitor;

- Require Roku to maintain transparent reporting of key performance metrics including Streaming Households and Average Revenue Per User (ARPU), which Roku has announced it will discontinue reporting in Q1 2025 according to its 2024 Form 10-K [Exhibit 14]

D. Award Plaintiff costs of this action;

E. Award Plaintiff pre-judgment and post-judgment interest as allowed by law; and

F. Grant such other relief as the Court deems just and proper.

24

## X. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,


PETITIONER, FILING PRO SE
JOSEPH DEAN
5131 MAYFAIR PARK COURT, TAMPA FL 33647
310-593-4485
Dated:  May 1, 2025


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing with the Clerk of the Court using

the CM/ECF system and served it via email on counsel for Defendant:

Elizabeth C. DeGori, DENTONS US LLP 1

Alhambra Plaza, Penthouse Coral Gables, Florida 33134

elizabeth.degori@dentons.com

**Contact Info:**

**Roku:**

Louise Pentland

Senior Vice President and General Counsel, Roku, Inc.

1701 Junction Court, Suite 100, San Jose, CA 95112

generalcounsel@roku.com

Phone number: 408-556-9391

Fax number: 408-364-1260

**Joseph Dean:**

joe@joedean.net

5131 Mayfair Park Ct. Tampa FL, 33647

Phone and Text number: 310-593-4485