UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH DEAN,

    Plaintiff,
v.                                                                    Case No. 8:24-cv-2383-WFJ-TGW

ROKU, INC.,

    Defendant.
_____/

## ORDER

Before the Court is Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint with Prejudice (Dkt. 32), Plaintiff's response (Dkt. 35) and Defendants' Reply (Dkt. 37). After careful consideration of the applicable law and the allegations of the Second Amended Complaint (Dkt. 30), the Court concludes the motion should be granted.

### BACKGROUND

On October 8, 2024, Plaintiff Joseph Dean initiated this action against Roku, Inc. ("Roku"), asserting violations of federal antitrust law. Dkt. 1. Mr. Dean is a Florida-based software developer who has developed and maintained a multimedia streaming service known as Veamcast since 2010. Dkt. 30 ¶ 14. Mr. Dean, who is proceeding *pro se*, develops software applications under the name "Veamcast" or Veamcast Corp. Dkt. 30 ¶ 2.

Veamcast Corp. has been an active Florida corporation since 2016.[1] Veamcast Corp. has filed four prior lawsuits in this District, all alleging federal antitrust claims. *See Veamcast Corp. v. Facebook, Inc.*, No. 8:20-cv-2667-KKM-AEP; *Veamcast Corp. v. Middle District of Florida, Tampa*, No. 8:24-cv-2111-MSS-CPT; *Veamcast Corp. v. Mclaren*, No. 8:24-cv-2112-WFJ-AEP; *Veamcast Corp. v. Roku, Inc.*, No. 8:24-cv-2113-SDM-AEP. As a corporation, Veamcast Corp. was required to obtain legal counsel but was unable to do so, and all the cases were dismissed.

After dismissal of three of these cases (Nos. 8:24-cv-2111, -2112, -2113), Joseph Dean filed two more antitrust cases: the instant action and *Joseph Dean v. Meta Platforms, Inc.*, No. 8:24-cv-2242-MSS-TGW. Mr. Dean named himself as plaintiff, rather than Veamcast Corp. An individual is not required to secure legal representation, and he is proceeding *pro se* in both pending cases.

In this case, Mr. Dean filed an amended complaint as a matter of right on November 21, 2024. Dkt. 6. Roku moved to dismiss the amended complaint and raised lack of subject matter jurisdiction. Dkt. 19. Plaintiff filed a response and also sought to amend the complaint a second time. Dkts. 26, 27. Mr. Dean was

---

[1] *See* https://search.sunbiz.org/inquiry/corporationsearch/byname and search for Veamcast Corp, last accessed Aug. 1, 2025.

granted leave to amend.  Dkt. 29.  He filed the Second Amended Complaint (Dkt. 30), which is now before the Court.  Dkt. 32.

## ALLEGATIONS

This case arises out of Roku's alleged exclusionary conduct in the market for 1) applications that interact with Roku's devices and 2) streaming platform operating systems.  Dkt. 30 ¶ 1.  The geographic market is defined as the United States.  *Id*. ¶ 31.  Roku allegedly used monopolistic power to restrict third-party developer access on its smart TV platform.  *Id*. ¶¶ 33–37.  Count I claims monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  *Id*. ¶¶ 63–68.  Count II claims exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.  *Id*. ¶¶ 69–75.

**<u>Veamcast's software application development</u>**

Roku is the "dominant" streaming platform in the United States and "has reached 90 million streaming households."  Dkt. 30 ¶ 3.  Although Roku offers Roku TVs, the Roku Channel, Roku streaming players, and a Roku mobile application, Plaintiff takes issue with Roku's application development and policies for third-party application development.  *Id*. ¶ 13.  Plaintiff's software applications "enhance the streaming experience for Roku users, including remote control capabilities, content discovery, and social sharing features."  *Id*. ¶ 2.  Plaintiff claims Roku restricted access to critical "commands and search functionality,

3

which third-party applications like Plaintiff's rely on" by "implementing undocumented and retroactive API [Application Programming Interface] changes that specifically target competitive functionality while maintaining the same functionality for Roku's own applications." *Id*. ¶ 4.  Plaintiff alleges that Roku also established "exclusive dealing arrangements through technical restrictions that substantially foreclosed competition." *Id*. ¶ 4.

Veamcast is described as a platform or service that provides video, voice, and photo publishing and sharing through its own applications. *Id*. ¶ 14.  The Veamcast applications "rely heavily" on Roku's proprietary Application Programming Interface ("API"), specifically External Control Protocol ("ECP") commands. *Id*. ¶ 15.  The APIs allow Veamcast application users to "record, capture, share, publish and link to media content; create and share playlists containing various media types; generate deep links within Roku apps that enable direct access to specific content . . . and direct content access across multiple streaming platforms; enable communication between users; and cast content from various sources to Roku TVs." *Id*. ¶ 15.

For example, the Veamcast Windows and Android applications rely on Roku's ECP for content controlling and casting as well as deep linking into content from the Veamcast Roku application or other applications such as YouTube, Netflix, and Prime streaming services. *Id*. ¶¶ 14, 16, 17.  The Veamcast Roku

4

application essentially allowed external control and integration with Roku's platform, thereby enabling a "second screen experience" allowing those applications function as remote control devices. *Id*. ¶ 17. Thus, access to Roku's ECP is essential for third-party applications, like Mr. Dean's, to interact meaningfully with Roku's platform. *Id*. ¶ 15.

**Restricted Access**

According to the complaint, the CEO of Roku "initially promised" that Roku would "let third parties publish content and applications that consumers can access directly from their TV." Dkt. 30 ¶ 5. Plaintiff alleges that once Roku achieved "market dominance," Roku retracted its position by "implementing technical restrictions that foreclose the promised third-party access." *Id*. ¶ 5. To develop applications compatible with Roku using Roku's APIs for "remote control, content casting, and social sharing features," Plaintiff invested "substantial resources." *Id*. ¶ 7. Roku's "retroactive revocation of API access without notice" harmed Plaintiff. *Id*. ¶ 7.

Although the timing is unclear, Plaintiff alleges that "since 2022," Roku has been implementing systematic changes to its user interface by automatically loading The Roku Channel upon TV startup and "systematically demoting recently used third-party apps." *Id*. ¶ 26. Additionally, in November 2023, Roku "launched Photo Streams, enabling the casting of photos from the Roku Mobile

5

App, replicating core functionality of Plaintiff's Veamcast platform, while restricting the APIs that would allow Plaintiff's application to provide similar features." *Id.* ¶ 27.

**Monopoly Power**

Plaintiff describes Roku's monopoly power to include 48.3% market share in the United States streaming platform operating system market as of the first quarter of 2024. Dkt. 30 ¶ 35. This monopoly power is alleged to include Roku's exclusive control over "essential APIs necessary for competition" that allows it to "remove API access without market consequences" and "retroactively remove functionality without prior notice to developers." *Id.* ¶ 34. Roku maintains its monopoly power by initially "positioning as an open platform before systematically reversing those commitments[,] implementing targeted API restrictions that specifically disadvantage competitors[,] maintaining identical functionality for its own applications while restricting third-party access[,] and [] exploiting platform control to identify and dominate emerging market segments." *Id.* ¶ 37.

**Anticompetitive Conduct**

Plaintiff identifies five areas of anticompetitive conduct. Dkt. 30 ¶¶ 38–55. First, Roku systematically restricted access to APIs and ECP commands, which targets competitive functionality and allows the same capabilities for its own Roku

6

applications. *Id*. ¶¶ 38–42. Plaintiff alleges that these restrictions created "an unlevel playing field designed to eliminate competition." *Id*. ¶ 41. Second, Roku leveraged its platform dominance to advantage Roku's own services. *Id*. ¶¶ 43–45. As examples, Plaintiff suggests the autoloading of The Roku Channel upon device startup and requiring additional steps to access competing apps by defaulting to Roku Channel content.

Third, Roku has created a "double-bind" for content providers—remain in the content provider's own less discoverable app "with diminished visibility in the Roku interface" or place their content in The Roku Channel "where Roku controls all advertising revenue and user data." *Id*. ¶ 46. Fourth, Roku obtains data from third-party application review and exploits the data to disadvantage developers by replicating core functionality, specifically of Plaintiff's platform. *Id*. ¶¶ 50–51. Finally, Roku's technical restrictions create exclusive dealing arrangements such as the Roku Mobile App is the only application that can fully control Roku devices. *Id*. ¶ 53. The technical barriers to third-party applications prevent competing functionality and render existing applications non-functional. *Id*. ¶¶ 54–55.

**Antitrust Injury to Mr. Dean individually**

Mr. Dean alleges that he directly competes in the market for applications that control and interact with Roku devices. Dkt. 30 ¶¶ 56–57. He claims the

systematic API restrictions have foreclosed him from this market. *Id.* ¶ 58. He asserts that these restrictions target functionalities that differentiate his applications from Roku's own and permit Roku to eliminate competition. *Id.* ¶ 59. He claims that "the targeted nature" of API restrictions shows anticompetitive conduct as opposed to normal competition. *Id.* ¶ 62.

The economic harm to Mr. Dean includes wasted development costs, lost revenue from now non-functional applications, depreciated asset value for technology investments, and lost market share and business opportunities. *Id.* ¶ 61. Plaintiff seeks damages of "not less than $150 million (representing threefold the sustained damages of $50 million)" caused by Roku's "anticompetitive conduct" and injunctive relief to restore API access to all, among various other requests. *Id.* ¶ 9 & at 24.

Roku's motion challenges the sufficiency of Mr. Dean's operative complaint on four grounds. Roku asserts, first, that the complaint constitutes an impermissible shotgun pleading. Second, Roku contests Plaintiff's Article III and antitrust standing and the defined relevant antitrust markets. Third, Roku claims that Plaintiff fails to allege antitrust violations, including Roku's monopoly power, any harm to competition, or the substantial foreclosure to competition. Finally, Roku argues that further amendment would be futile. Each ground will be addressed in turn.

## DISCUSSION

Applying the *Twombly-Iqbal* standard, all factual allegations, not legal conclusions, are accepted as true, and all reasonable inferences from those alleged facts are construed in the light most favorable to Plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-89 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 does not require detailed allegations, but the complaint must offer more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 557 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). *Pro se* pleadings, although liberally construed, must not be rewritten by the court to sustain an action. *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168–69 (11th Cir. 2014).

**Shotgun Pleading**

The Second Amended Complaint minimally satisfies Rule 8(a)(2) and Rule 10(b). *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015) (defining "shotgun pleading"). The complaint contains numbered paragraphs (1–75), subtitles to delineate various sections, and two separate counts, each alleging a single claim for relief. As gleaned from its response, Defendant had "adequate notice of the claims against [it] and the grounds upon which each claim rests." *Id*. at 1323. Accordingly, the Second Amended Complaint is not an impermissible "shotgun pleading."

**Standing**

Traditional Article III standing requires that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Tokyo Gwinnett, LLC v. Gwinnett Cnty., Ga.*, 940 F.3d 1254, 1262 (11th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  A proper antitrust plaintiff, however, must have more than Article III standing ("injury in fact" and "case or controversy").  *Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010); *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991)).  The plaintiff must have antitrust standing.

Section 4 of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a).  A plaintiff must establish standing to sue as the proper party "to vindicate the public's interest in enforcing the antitrust laws." *Palmyra Park Hosp. v. Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529 (1983)).  Antitrust standing under Sectopm 4 of the Clayton Act is twofold: (1) the plaintiff must have suffered

10

antitrust injury; and (2) the plaintiff must be an "efficient enforcer" of the antitrust laws. *Id*. at 1299.

*Antitrust Injury*

Antitrust injury is the type of injury "that the antitrust laws were intended to prevent and that flows from that which makes the [defendant's] acts unlawful." *Palmyra Park Hosp.*, 604 F.3d at 1299 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent." *Palmyra Park Hosp Inc.*, 604 F.3d at 1299. "[A]n antitrust plaintiff must show harm to competition rather than to competitors." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (internal quotations and citation omitted). Harm to competition is measured by the "impact on the market rather than . . . on competitors." *Id*. The plaintiff "must be one against whom anticompetitive activity is directed, and not one who has merely suffered indirect, secondary, or remote injury." *Kifle v. Google LLC*, No. 1:22-cv-4204-JPB, 2023 WL 5538289, at *5 (N.D. Ga. Aug. 28, 2023) (quoting *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir. 1984)).

For the first time, Mr. Dean is now suing in his individual capacity. Mr. Dean alleges that he has been developing software applications under the name Veamcast and an API for video/voice/photo/link publishing and sharing service named Veamcast." Dkt. 30 ¶¶ 2, 14–17. The prior actions were brought by Veamcast, as the developer of the applications and an "API for a video/voice/photo publishing and sharing service." *Veamcast Corp. v. Roku, Inc.*, No. 8:24-cv-2113-SDM-AEP, at Dkts. 1 at 1; 3 at 1. As sole owner and CEO of Veamcast, Mr. Dean attempts to allege that he suffers individualized harm from Roku's systematic API restrictions which have foreclosed him from competing in the market for applications that control and interact with Roku devices. Dkt. 30 ¶¶ 56, 57, 68, 75.

The complaint alleges that Mr. Dean was harmed because he wasted development costs and resources to implement the now-disabled features in his application, he lost revenue from now non-functional application, and lost market share and business opportunities. Dkt. 30 ¶ 61. Mr. Dean fails to identify any lost business opportunities, investment, change in market share, or economic harm. *See Id*. ¶ 61. Notably, Mr. Dean does not allege antitrust injury to competition generally, but only claims he was individually harmed. *See Id*. ¶¶ 56–62.

Mr. Dean and Veamcast are not interchangeable plaintiffs. "Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business."

12

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984); *Kifle*, 2023 WL 5538289, at *5 (quoting same). While an officer or shareholder of a company may suffer "indirect" or "secondary" financial injury from antitrust violations, these individuals are not the target of any alleged anticompetitive practices. *Id.*; *see also Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1341 (11th Cir. 2017). Like the plaintiff in *Kifle*, any personal harm Mr. Dean suffered was the indirect result of the allegedly anticompetitive conduct that directly concerns Veamcast.

Even if Mr. Dean could sue for harm to Veamcast, neither party suffered an antitrust injury. The two alleged markets affected are 1) the market for applications that control and interact with Roku devices, and 2) the market for streaming platform operating systems. Dkt. 30 ¶¶ 28–30. Roku allegedly committed the following two acts causing injury: 1) Roku discontinued the use of ECP commands and deep linking from parties other than Roku in the Roku API; and 2) Roku launched Photo Streams, which incorporated some of Veamcast's functionality. *Id.* ¶¶ 21, 27, 39, 51, 55. The complaint fails to connect the alleged injuries to the asserted markets—no affected smart TV operating systems, streaming devices, content distribution platforms, or mobile applications other than Veamcast. Neither Mr. Dean nor Veamcast has alleged that either was attempting to create a substitute platform to Roku.

13

The complaint alleges lost revenue to Mr. Dean. There is no injury allegedly suffered to any person other than Mr. Dean; consequently, he has not alleged a harm to competition. As such, Plaintiff has no antitrust standing because antitrust law protects competition, not individual competitors. *Wesley Fin. Grp., LLC v. Westgate Resorts, Ltd.*, 746 F. Supp. 3d 1342, (M.D. Fla. 2024) (citing *Spanish Broad Sys. of Fla.*, 376 F.3d at 1071).

The crux of Mr. Dean's complaint is Roku restricting third-party access to its APIs. That Mr. Dean made use of Roku's APIs does not make him a competitor. *See Greenflight Venture Corp. v. Google LLC*, No. 24-cv-80395-R, 2024 WL 4723121, at *4 (S.D. Fla. Nov. 8, 2024) (citing *Feldman*, 849 F.3d at 1341). As argued by Roku, it has no duty under the antitrust laws to allow anyone access to its APIs. Dkt. 32 at 24 (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms and conditions of that dealing."), and *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (finding complaint insufficient because Facebook allegedly refused to sell data to any competitive third-party developer).

Roku disabled API functionality, which is directed at Roku's operation of its own products and own choices of whether to assist third-party developers. Mr. Dean does not identify any developers other than himself. Mr. Dean takes issue

14

with Roku's refusal to reverse its decision to restrict API access. At best, Mr. Dean alleges a standard refusal to deal in which situation Roku, even assuming it is a monopoly, has no duty to continue to share its intellectual or other property. *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 29 (D.D.C. 2021), *aff'd sub nom*. *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.D. Cir. 2023).

Nor does the complaint allege an exception to the general refusal to deal rule. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). There is no voluntary and profitable course of dealing that Roku terminated allegedly without a valid business reason. As pled, Roku "announced contradictory security requirements for ECP commands," which suggests a valid business reason of maintaining security for third-party access to software. Dkt. 30 ¶ 21.

Finally, the Court finds the complaint fails to allege facts showing that the harm to Mr. Dean was "inextricably intertwined" with the broader harm to competition. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483–84 (1982). *McCready* found that a patient/subscriber to a health plan suffered antitrust injury even though the patient was a consumer and not a competitor of the conspirators. There, the plan reimbursed psychotherapy services with a psychiatrist but not with a psychologist. Under the plan, a subscriber patient, such as Ms. McCready, was compelled to choose between continuing therapy with her

psychologist at an increased net cost or switching to a psychiatrist to receive reimbursement. Because the result of the Blue Shield conspiracy suppressed competition in the psychotherapy market (patients choosing psychologists suffered increased costs), a patient's injury was "inextricably intertwined" with the injury the conspirators sought to inflict on the provider psychologists. *Id*.

*McCready* does not support antitrust standing for Mr. Dean or Veamcast. Mr. Dean and Veamcast are not consumers. Neither Mr. Dean nor Veamcast is entitled to financial benefits under any contract with Roku. Unlike *McCready*, there is no area of the economy endangered by a breakdown of competitive conditions resulting from Roku's restriction of access to APIs. Mr. Dean, as an officer or owner of an associated business entity, Veamcast, cannot rely on the alleged harm to Veamcast as if it belonged to him individually.

<u>Efficient Enforcer</u>

To satisfy the second prong of antitrust standing, the plaintiff "must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013). Mr. Dean has failed to allege facts showing that he or Veamcast is a competitor, much less a willing and able one, in the markets of smart TV operating systems, streaming devices, or content distribution platforms. *See* Dkt. 30 ¶¶ 28–30. The

16

complaint does not allege that Mr. Dean or Veamcast was attempting to create a potential platform substitute for Roku. *See U.S. v. Google LLC*, No. 20-cv-3010 (APM), 2024 WL 3647498, at *170 (D.D.C. Aug. 5, 2024) (stating relevant question is not whether nascent competitor's technology would "actually have developed" into a viable platform substitute but whether technology has "showed potential").

Neither Mr. Dean nor Veamcast has shown it has the financial ability to enter the market, and no facts have been alleged about any other competitors poised and ready to enter the relevant market "but for" Roku's exclusionary conduct. *See Sunbeam*, 711 F.3d at 1273. Moreover, Mr. Dean, having suffered at most indirect injury and having alleged only speculative damages, lacks antitrust standing to seek an injunction. *See Duty Free Americas, Inc. v. Estee Lauder Cos. Inc.*, 797 F.3d 1248, 1273 (11th Cir. 2015) (affirming dismissal based in part on standing). Based on these alleged facts, Plaintiff is not an efficient enforcer for purposes of antitrust standing.

Mr. Dean lacks standing to sue Roku as a competitor for applications that control and interact with Roku devices. Although Mr. Dean may have alleged that Veamcast (not Mr. Dean) is a developer of software for applications, he has not plausibly alleged he competes with Roku, or anyone else, in this market. *See Greenflight Venture Corp. v. Google LLC*, 765 F. Supp. 3d 1267, 1282 (S.D. Fla.

17

2025). Mr. Dean also lacks standing to sue Roku as a competitor in the U.S. streaming platform operating system market. The complaint is devoid of any allegations that either Mr. Dean or Veamcast creates a streaming platform operating system.

**Monopoly/Refusal to Deal under Sherman Act/ Exclusive Dealing under Clayton Act**

To state a claim under Section 2 of the Sherman Act for monopolization, a plaintiff must 1) define the relevant product and geographic market in which the defendant has monopoly power, and 2) show that the defendant willfully acquired or maintained that power through exclusionary conduct. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 830 (11th Cir. 2015). Plaintiff defines the geographic market as the United States, although the complaint also references Roku's operations in Canada and Mexico. Dkt. 30 ¶¶ 31, 35. As to the two relevant product markets (applications that interact with Roku devices, and the streaming platform operating system market), Plaintiff fails to define the "contours" of the product market or reference cross-elasticity of demand and substitutability of any products. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 n.13 (11th Cir. 2010).

With respect to market power, Plaintiff alleges that Roku has only 48.3% "market share in the U.S. streaming platform operating system market" as of the first quarter of 2024. Dkt. 30 ¶ 35. A market share of equal to or less than 50% is

18

insufficient as a matter of law to constitute monopoly power. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (collecting cases), *abrogated in part on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). In addition to less than a majority market share, Plaintiff has failed to establish that he is a competitor in the market of U.S. streaming platform operating systems. The complaint fails to define any market share for applications that interact with Roku devices.

Under Section 3 of the Clayton Act, an exclusive dealing arrangement is an "agreement by which a seller agrees to sell all of its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a particular commodity exclusively from a particular seller." *McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*, No. 09-62033-civ, 2011 WL 2118701, at *4 (S.D. Fla. May 27, 2011) (citation omitted). An exclusive dealing arrangement does not violate Section 3 of the Clayton Act "unless there is a probability that the agreement will foreclose competition" in the relevant market. *Id*. The foreclosure must be substantial—a substantial share of the relevant market. *McWane, Inc.*, 783 F.3d at 835 (citing *Microsoft*, 253 F.3d at 69). "The ultimate question remains whether the defendant's conduct harmed competition." *Id*.

Plaintiff fails to allege any exclusive contracts or arrangements and fails to define the share of a relevant market that has been foreclosed by Roku's alleged

19

restriction of APIs.  The relevant product and geographical markets are ill-defined with no plausible contours.  *See Jacobs*, 626 F.3d at 1336 (requiring a complaint to plausibly suggest contours of relevant geographic and product markets).  The complaint fails to connect, through factual allegations, Roku's power in the application or platform market and the harm to competition in those markets.

This pleading was Mr. Dean's third attempt to state a claim for relief in this lawsuit.  Having determined that Mr. Dean cannot establish antitrust standing, and Veamcast having unsuccessfully filed prior cases asserting these same allegations, the Court will not permit more opportunities to replead when any further amendment would be futile.

Accordingly, Defendant's motion to dismiss the Second Amended Complaint (Dkt. 32) is granted.  Plaintiff's motion for leave to file an amended complaint (Dkt. 42) is denied.  The Second Amended Complaint is dismissed without leave to amend.  The Clerk is directed to close the case.

**DONE AND ORDERED** at Tampa, Florida, August 8, 2025.

_____
WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO:**
Plaintiff, *pro se* and Counsel of record